[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter came before the court on cross-motions for contempt and on Mr. Vallas' motion to modify.
At the time of the February court hearing, Mrs. Vallas had refused, with few exceptions, Mr Vallas' attempts at visitation since September 1997.
The court finds Mr. Vallas' allegations in his motion for contempt to be valid. The court will address some of these incidents.
Mrs. Vallas claimed three incidents of abuse involving Mr. Vallas' family members. She claims the children told her the following:
1. That the plaintiff's brother, Demetrius, tried to suffocate one of the children. (In conversations with the court-appointed attorney for the children, the children described this episode as a pillow fight and attached no significance to it.) Mrs. Vallas also claimed that Demetrius suffered from a "mental illness." Testimony revealed that he had sought counselling subsequent to a failed relationship. The court finds that this CT Page 6665 event is not competent evidence of a "mental illness."
2. That Mr. Vallas' father had threatened the children with a belt. (The children giggled when asked about this by the court-appointed attorney. Apparently their grandfather teased the children that he would take the belt to them if they did not go to bed. The children told their attorney they knew their grandfather would never hit them).
3. That Mr. Vallas' brother, who was living with him, had hit one of the children and given him a "fat lip."
(The children denied this, remembered the incident, and said the child in question had fallen while playing in the backyard.)
The children met with their attorney on three separate occasions. In the course of hearing the evidence, the court had concluded, although not yet expressed, that the allegations made against Mr. Vallas and his family were spurious and calculated to manipulate Mr. Vallas. When the court-appointed attorney for the children gave his findings at the conclusion of the evidence, the court's views were confirmed.
Mr. Vallas had difficulty in calling his children. Mrs. Vallas would hang up, tell him it was not a good time, and generally block his efforts to speak with them. On one occasion when he was able to speak with one of the children, Mrs. Vallas called out from the background, "Tell him your Dad just paid for your new glasses." This reference to "Dad" was to Mrs. Vallas' fiance, with whom she and the children reside. Mrs. Vallas admitted encouraging the children to call her fiance "Dad." The court finds this conduct extremely inappropriate, and that this practice is designed to undermine Mr. Vallas' place in the lives of his children.
The original agreement between the parties provided for visitation on Mother's Day, but not on Father's Day. The court regards this as an oversight. When Mr. Vallas attempted to visit the children on Father's Day, Mrs. Vallas refused. The police were called, and they permitted Mr. Vallas to see the children. The police have been involved in this situation on more than one occasion. This is to be avoided in the interest of the children. The evidence shows that Mrs. Vallas has obstructed Mr. Vallas efforts to effectuate his right of visitation in all respects. Moreover, even when he is "permitted" visitation by Mrs. Vallas, CT Page 6666 he is forced to "jump through hoops" by her rigid demands as to exact times, etc. Mr. and Mrs. Vallas have joint custody. The law regards this concept as two parties with equal rights to visitation and decisions regarding the children's welfare. Moreover, this concept recognizes either parent as fit to provide primary residence.
 ORDERS
Mr. Vallas will have visitation two weekends each month and three weekends in a five weekend month. He will notify Mrs. Vallas within thirty days as to which weekends he prefers and will notify the court as to his selection. Mr. Vallas will also designate the time for pick-up and return. Said selections will then be incorporated into and made part of this order. The court is permitting this privilege due to the logistical difficulties presented by Mr. Vallas' current residency in Canada.
The parties will alternate Christmas (including Christmas Eve) and Thanksgiving. Christmas vacation will be divided between the parents.
Extended school vacations will be alternated.
Mr. Vallas will have six consecutive weeks of visitation in the summer.[1]
Mr. Vallas will have the children the evening before Father's Day and all day on Father's Day. Mrs. Vallas will be permitted the same schedule on Mother's Day. Mr. Vallas is to reschedule his weekend visit if it falls on Mother's Day weekend.
Mr. Vallas will be entitled to visit the children on his birthday.
There are to be no restrictions placed upon Mr. Vallas during visitation. He is to be permitted to take them wherever he wishes and to have them in the presence of anyone he deems appropriate. During visitation, Mr. Vallas may leave the children in the custody of anyone he deems appropriate. There are to be no restrictions placed upon any member of his family with regard to visits with the children. Should Mr. Vallas become engaged to be married he is not to permit the children to call his fianceé "Mom" during his engagement. Mrs. Vallas will not permit the children to call any person "Dad" unless said person is the legal CT Page 6667 stepfather of the children. Should the children acquire a stepfather, it shall be their decision as to how to address him.
The parties will not contact each other's employer.
Mrs. Vallas' repeated attempts to have the court hold Mr. Vallas in contempt have necessitated several court hearings. To attend these hearings, Mrs. Vallas has merely to cross a town line. Mr. Vallas must attend from Canada at great expense. Insofar as the court has found no merit to Mrs. Vallas' claims, it is appropriate that she reimburse Mr. Vallas for his attorney's fees for these hearings.[2]
Mrs. Vallas has health insurance available to her for the children at no cost. Therefore, she will cover the children. Should this insurance no longer be available, Mr. Vallas will cover the children, and Mrs. Vallas will reimburse him for one-half the cost, if any. In either case, they will each pay one-half of the uncovered expenses, including, but not limited to, eyecare, eyewear, orthodonture and psychological or psychiatric treatment. Any deductible amount on either party's insurance will be shared equally.
As to the change in circumstances between the parties, Mr. Vallas' circumstances and income have diminished. He was forced to leave Northeast Utilities as he did not feel the future prospects for that company were favorable. Northeast Utilities has a non-compete clause against Mr. Vallas for two years. The only employment he could find outside this restriction, which would enable him to have a territory including Connecticut, was based in Canada, although he had a more lucrative offer to go to Detroit. Mr. Vallas has a modest apartment in Canada and still maintains his local home for the benefit of the children. He plans to return as soon as the non-compete restrictions have expired. Despite Mrs. Vallas' claims that he has "relocated", the court finds that Mr. Vallas' principal residence remains in Connecticut, and that his situation in Canada is temporary. In order that the children can come "home" on their visits, Mr. Vallas maintains two residences. On the other hand, Mrs. Vallas resides with her fiance in his home. His mortgage is $1100 per month. Mrs. Vallas' affidavit indicates that she pays "rent" of $1000 per month, plus $288 for utilities. The court questions these amounts, particularly in view of her testimony and her note by asterisk on her affidavit that she "shares" expenses with her fiance. The court finds that Mrs. Vallas' circumstances have CT Page 6668 improved substantially as her income has increased and her fiancé is contributing toward her support. Unkelbach v. McNary,244 Conn. 350, ___ A.2d ___ (1998). Mrs. Vallas' affidavit reflects expenses that would support a household on her own, yet it is clear that she has substantial assistance. Mrs. Vallas' affidavit does not reflect the actual contributions of her fiancé.
Mrs. Vallas attempted to show that Mr. Vallas was concealing income from six properties in Meriden. The court finds these properties to be worth less than is owed on them, and that they constitute a negative cash flow on Mr. Vallas' assets. All these properties are in foreclosure and have no equity.
In view of the above, the court finds that a deviation in the child support guidelines is appropriate.[3] Accordingly, Mr. Vallas will pay $170 per week pursuant to a wae execution, if possible.
Mr. Vallas is to be permitted to call and speak to the children anytime he deems appropriate. The children are to be encouraged to tell him themselves if they are unable to talk due to demands of school work, etc.
The evidence shows that Mrs. Vallas does not send appropriate clothing for the children's visits. For Mr. Vallas' father's funeral, she was asked to send them in "church" clothes. She sent them in play clothes and ripped sweatshirts. Mr. Vallas had to purchase appropriate clothing. Mrs. Vallas will, in future, send the children with play clothes and dress clothes on every visit. Should it become necessary for Mr. Vallas to purchase clothing in future because it is not provided for a visit, Mrs. Vallas will pay one-half the cost of the purchase of suitable clothing upon submission of the bill by Mr. Vallas.
Due to the frequent requests for court intervention in this case, the court entered temporary orders, and indicated that, if no further problems developed, final orders would issue in sixty days. The court has had no notice of any difficulty. The court also ordered a final substantially, and the court is pleased that the attorney for the children notes that ". . . the children appear relieved that this issue between their parents appears to be resolved." The parties are to be commended for what appears to be a new spirit of cooperation which reflects their individual regard for the children's well-being.
The parties first appeared before this court a few days CT Page 6669 before Christmas. During that time, Mrs. Vallas made known her claims concerning Mr. Vallas' family's alleged abuse of the children. It was for that reason that the court appointed an attorney for the children. Between that court appearance and the time the present hearing was held, Mr. Vallas' father died without seeing his grandchildren. It is doubtful that this tragedy would have occurred if this court had the benefit of handling the earlier disputes between the parties. To avoid a similar occurrence in future, this court will retain jurisdiction over this case should any further motions be filed.
Finally, it is noted that any matter not specifically addressed in this decision will be governed by the original agreement. Should clarification be required, the parties may so request in interrogatory form. The parties may alter any provision of this order, with the exception of financial terms, by agreement, in the interest of the children.
Dunnell, J.